**Lamont D. ROBINSON, # 232275, Petitioner,**

v.

**Jimmy STEGALL, Respondent.**

**No. CIV A 98–CV–72752–DT.**

United States District Court, E.D. Michigan, Southern Division.

Aug. 6, 2001.

Lamont Robinson, New Haven, CT, Pro se.

Janet Van Cleve, Michigan Department of Attorney General Habeas Corpus Division, Lansing, MI, for Respondent.

*OPINION AND ORDER (1) DENYING HABEAS CORPUS PETITION, AND (2) INDICATING A WILLINGNESS TO GRANT A CERTIFICATE OF APPEALABILITY AS TO PETITIONER'S CLAIM CHALLENGING THE TRIAL COURT'S RESTRICTION OF CROSS-EXAMINATION*

BORMAN, District Judge.

## I. Introduction

Petitioner, Lamont D. Robinson ("petitioner"), has filed this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 alleging that he has been convicted and sentenced in violation of his constitutional rights. Petitioner challenges his conviction after a jury trial of involuntary manslaughter, M.C.L. § 750.321. Petitioner then pleaded guilty to being a fourth felony habitual offender, M.C.L. § 769.12. Petitioner was sentenced to life imprisonment for this offense.[1] For the reasons set forth below, the petition shall be denied.

## II. Factual Background

This action arises out of the death of a seventeen month old infant child named Lorenzo Merriweather. Petitioner was the mother's boyfriend. The child died on May 29, 1992, and was examined by a medical examiner the next day. The medical examiner gave detailed testimony concerning injuries suffered by the child. The infant had at least four separate bruises on his forehead. The infant also bruises on the top and back of the head and a large abrasion, or scraping of the skin, covering about one and a half inches. There was also a linear abrasion on the back of the head. Transcript Volume IV ("Tr.Vol.IV") at 60–64.

The child had bite marks on the back of his left shoulder which had been made by an adult human. There was a large bruise on the lower right abdomen above the pubic bone and bruises on the upper portion of the front of the chest over the sternum, or breastbone. There were linear marks and abrasions on the front of the child's legs which may have been made with a comb. *Id.* at 64–69.

Examination of the bruises on the child's head showed sufficient bleeding in the bruised areas to indicate that, while the injuries were fresh (less than twelve hours old) the child had lived for a considerable time after they were inflicted. If the child had died immediately after the trauma to the head, there would not have been time for blood flow into the area to cause the bruising present. *Id.* 69–74.

---

1. Petitioner states in his habeas application that he was sentenced to twenty years imprisonment. However, review of the sentencing transcript shows that he was sentenced to ten to fifteen years for involuntary manslaughter and life as a fourth felony habitual offender. Sentencing Transcript ("Tr.") dated April 5, 1994, at 30–31; 40. After imposing the habitual offender life sentence, the trial judge vacated Petitioner's ten to fifteen year sentence for involuntary manslaughter. Sentencing Tr. at 41. The sentencing transcript indicates that Petitioner had committed four prior felonies, including another homicide. *Id.* at 33; 37–38. The Michigan Court of Appeals opinion affirming Petitioner's conviction and sentence also states that Petitioner "was sentenced to life imprisonment as an habitual offender." *People v. Robinson*, Michigan Court of Appeals Docket No. 175929 (January 17, 1997) at 1.

Internal examination revealed that the child suffered from an incomplete fracture of the base of the skull near the ears. There was marked swelling of the brain and bruises inside the brain due to external trauma blunt force injury. The doctor opined that the injuries to the child's head were too numerous to have been caused by a fall down a flight of stairs. *Id.* at 75. The skull fracture, brain bruises, and swelling of the brain were caused by a heavy type of blunt force. Another child could not have caused such injuries. These injuries could have been caused by an adult striking the child with his or her hand. *Id.* at 75–77.

The child's second and third cervical vertebrae were separated, an injury which would only be caused by a force injury to the head. This injury to the cervical spine could have been caused by a blow to the head from a hand, or from the child falling on his head. In conjunction with the child's other head injuries, the doctor opined that the cervical spine injuries were caused by blunt force injuries or blows to the head. *Id.* 78–80.

Internally, the chest cavity showed severe lacerations of the lungs. Force so severe had been applied to the chest that the child's lungs were torn at their roots of attachment to the body cavity. Massive blunt trauma would be required to cause these injuries. These injuries to the roots of the lungs were not consistent with injuries caused by performing cardiopulmonary resuscitation ("CPR"). The injuries to the surface of the child's chest could have been caused by CPR. However, internal injuries caused by CPR generally involve fractures of the ribs and may involve injuries to the outer portions of the lungs and/or heart, not tears of the lungs' roots. In this case, there were no injuries to the

outer portions of the child's lungs and/or heart, but the lungs' roots were torn. The doctor therefore opined that the internal injuries to the child's lungs were consistent with heavy blunt trauma to the chest, but not consistent with CPR. *Id.* at 80–83.

There were lacerations or tears to the liver and injuries to the bowel and the mesentery, the attachment of the bowel to the body wall. These injuries would only result from intended blunt force injuries to the abdominal region; they would not result from a fall. *Id.* at 83. There were also injuries to both kidneys. These were deep body injuries involving tearing of the urethra where it attaches to the kidneys. There was also an external tear to the right kidney.

The internal injuries to the child were fresh injuries which occurred less than twelve hours before his death. The last injury the doctor described was a collection of blood in the child's scrotal sac and an injury to the left testicle, indicating that the testicle and scrotum had been struck with a direct blunt force injury.

The doctor concluded his direct testimony by opining that Lorenzo Merriweather "died of multiple inflicted blunt force injuries, and these injuries included the head, chest, and abdomen." *Id.* at 87.

Marjorie Merriweather testified that she was the mother of Lorenzo Merriweather's mother. Marjorie Merriweather testified that Petitioner was her daughter's boyfriend, but was not Lorenzo's father. Marjorie Merriweather, testified that she last saw the child alive on May 12, 1992. The child appeared to be in good health on that date. The next time she saw the child he was dead.[2] Tr. Vol. II at 178–83.

Laverne Robinson, Petitioner's sister, testified that Petitioner and the baby Lor-

2. Respondent contends that Marjorie Merriweather testified that she saw the child "earlier in the evening" and that he appeared to be

"fine and healthy," implying that this witness saw the infant on the day of his death before

enzo Merriweather were at her house on the night of May 29, 1992, when Lorenzo died. Petitioner was staying at her house in the basement. On the evening of May 28, Petitioner and the baby were watching television alone. The baby had a cold and had a runny nose. The baby did not appear to have any visible bruises or other injuries at that time. Petitioner asked her if she had any cold medicine. Ms. Robinson did not see recall seeing Petitioner give any medicine to the baby.

The next time Ms. Robinson saw Petitioner was the early morning hours of May 29, 1992. At 3:56 a.m., Petitioner came to Ms. Robinson's bedroom door and asked for a diaper. Petitioner came into her bedroom, got a diaper, and left. Shortly thereafter, she heard the basement door open and close. About fifteen or twenty minutes later, Petitioner came upstairs and went into the bathroom. After Petitioner came out of the bathroom, he went into the dining room with the baby. Later that same morning, Petitioner knocked on Ms. Robinson's door again and said he thought that the baby's heart had stopped. When Ms. Robinson went into the dining room and observed the baby, he was still breathing. Ms. Robinson told Petitioner to call 911. Petitioner replied that he already had done so. Petitioner Tr. Vol. III at 4–23.

On cross-examination, Ms. Robinson testified that she had never seen Petitioner abuse or hurt the baby. On the contrary, she had seen Petitioner play with, feed, and dress the child. Petitioner appeared to be upset while waiting for the ambulance to arrive. Ms. Robinson did not hear the child cry or observe any other evidence of it being hurt in the evening or night before Petitioner told her he thought the child had stopped breathing and called for emergency assistance. Tr. Vol. III at 23–40.

Charles William Prather testified that he was working as a River Rouge firefighter and EMS technician on May 29, 1992. He and his partner answered a call for assistance received at about 4:23 a.m. The call indicated that a small child was having difficulty breathing. When Prather and his partner arrived, Petitioner was standing in front of his sister's house, holding the child. The child was breathing rapidly and had a bleeding welt or bruise at the base of its skull. The child also had some small puncture wounds on his leg. The child was lethargic and moved very slowly. He would close his eyes and keep them closed for a long time. Petitioner said that the child had stopped breathing and he had shaken it to wake it up. Petitioner told Prather that the baby had gotten the bump on its head by falling down the stairs two days before. However, the bump was still bleeding and did not appear to be two days old. It appeared to be very fresh, perhaps still swelling. Tr. Vol. III at 78–126.

Detective-sergeant William Ellerbrake ("Ellerbrake") of the Dearborn Police Department testified about his interrogation of Petitioner on June 2, 1992, at about 4:30 or 5:00 p.m. and the statement Petitioner made to him. Ellerbrake read Petitioner his *Miranda* warnings when he came into contact with him.[3] Petitioner was born on

---

he was killed. Respondent's Brief at 6. Review of the transcript shows that the last day Marjorie Merriweather saw the infant Lorenzo Merriweather alive was May 12, 1992. Tr. Vol. II at 180–83.

**3.** Law enforcement officers must give "Miranda warnings" before interrogating individuals in custody. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In *Miranda*, the Supreme Court held that an individual in police custody may not be interrogated until and unless he is first advised that he has the right to remain silent; that anything he says may be used against him; that he has the right to an attorney; and

July 14, 1972, and was nineteen years old at the time of his interrogation. Petitioner was fed just before his interrogation began. Ellerbrake gave Petitioner a written copy of the rights he would read to him, so Petitioner could follow along. After reading Petitioner his rights, Ellerbrake asked Petitioner if he understood each of his rights. Petitioner replied that he did. Ellerbrake asked if Petitioner was willing to give up his rights and make a statement. Petitioner replied that wanted to make a statement. Petitioner signed and dated a form indicating that he understood his rights. Tr. Vol. IV at 114–19.

Ellerbrake informed Petitioner that he was being questioned about the death of Lorenzo Merriweather. Ellerbrake informed Petitioner of the nature of the child's injuries and asked him if he could explain how they may have occurred. Petitioner first said that he did not know how the child was injured. Next, Petitioner said that in May of 1992, he had hit the child with a pillow and that he had fallen to the ground possibly accounting for the injuries. Petitioner also said that on the Memorial Day weekend he tackled the boy on a carpeted basement floor with cement underneath, possibly explaining the injuries.

Ellerbrake told Petitioner that a forensic specialist could tell how old the child's injuries were by examining his wounds. Petitioner then offered another explanation. This time, Petitioner said that the child had a cold and was sleepy. Petition-er woke him up to feed him a banana. The boy choked on the banana. Petitioner then struck the child very hard in the stomach area to dislodge the banana. Petitioner did not reply when asked why he would awaken a sick, sleeping child in the middle of the night to feed him a banana. Ellerbrake said the it was good Petitioner mentioned this because the autopsy would discover any partially chewed banana that was present. Petitioner then said he thought the boy had spit out the banana. When told that any spit-out banana should be found in the area, Petitioner said that maybe there had not been any banana.

Petitioner then said that the child had become woozy and he tried to perform CPR on him, hitting him on the chest. Petitioner also said that he shook the boy, bit him hard several times, and poked him with a metal comb to try to arouse him. Petitioner made two phone calls while in custody. Tr. Vol. IV 114–130. Finally, Petitioner said, " 'I killed Lorenzo because I didn't know how to care for a kid.. Lorenzo would still be alive if someone else had been watching him.' " Tr. Vol. IV at 130. It took Petitioner about an hour and a half to make his statement, taking the time away for making two phone calls, using the bathroom, and getting a drink of water into account.

On cross-examination, defense counsel asked Ellerbrake if he had talked to a Sergeant Herrera about what Petitioner may have told Herrera earlier. The trial

---

that an attorney will be appointed for him if he cannot retain one. These warnings are an "absolute prerequisite to interrogation," said the court, 384 U.S. at 467, 86 S.Ct. at 1624, and without the warnings, the fruits of a custodial interrogation are inadmissible at trial. The Supreme Court held that: To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege.... But unless and until such warnings are demonstrated ..., no evidence obtained as a result of interrogation can be used against him. 384 U.S. at 478–479, 86 S.Ct. at 1630 (footnote omitted).

*Miranda*, then, creates procedural safeguards to secure the Fifth Amendment privilege against self-incrimination.

judge sustained the prosecutor's objection to questioning Ellerbrake about Herrera's state of mind. Defense counsel asked Ellerbrake whether he had used Petitioner's grief against him and whether Ellerbrake had told Petitioner he had killed the Lorenzo before Petitioner had said he did so. Ellerbrake replied in the negative to both of these questions.

A tape recording of Petitioner's statement to the police was played for the jury. The recording indicates that Detective Dan Herrera of the River Rouge Police, Detective Sergeant William Cooper, and Petitioner were present when the recording was made. Initially, when informed that he had the right to have an attorney present, Petitioner replied that he did not. When Petitioner's right to have an attorney was reiterated, Petitioner asked, "Can I get a lawyer in here right now?" Tr. Vol. VI at 80. Detective Herrera replied, "If you want." *Id.*

Immediately after Herrera said this, the following exchange was recorded:

Mr. Robinson: And I have to wait for him to come right here, or we'll have to presume [sic] this tomorrow?

Mr. Herrera: No, if you want to make a statement, and you want a lawyer present, no questions will be asked of you. You have to afford your own attorney. If you cannot afford your own attorney, one will be appointed for you, without cost, by the court, prior to any questioning. Do you understand that?

Mr. Robinson: Yes.

Mr. Herrera: Okay. Do you want an attorney present, or do you want to go ahead and make a statement?

Mr. Robinson: I'll make a statement.

Mr. Herrera: Now you also understand that at any given time, you can exercise your rights not to answer any questions or make any statements. Do you understand that?

Mr. Robinson: Yes.

Mr. Herrera: Because you have understood these rights and under the law, you have not been threatened or promised anything, is that true?

Mr. Robinson: Yes.

Mr. Herrera:—and that you now desire and agree to answer any questions that are put to you or make any statements?

Mr. Robinson: Yes. And I have the right to stop talking—

Mr. Herrera: Pardon me?

Mr. Robinson: I have the right to stop talking when I want to?

Mr. Herrera: You have the right to stop talking any time you want to.

Tr. Vol. VI at 80–81.

The explanation and reiteration of Petitioner's rights continued. Petitioner stated that he understood all of his constitutional rights and that he wanted to make a statement.

In his statement, Petitioner admitted hitting Lorenzo with a closed hand, like a fist, because he thought his heart had stopped after he gave him some food and he thought he was choking. Later, he pressed on his chest, attempting CPR. Finally, he hit him with a comb, slapped and shook him, grabbed and shook his Adam's apple, and bit him on the shoulder, trying to wake him up, but Lorenzo did not respond, so he called 911. Petitioner claimed that Lorenzo became alert and tried to get up in the ambulance, but the attendant held him down and told him he could not get up. Petitioner stated that he did not intend to harm or kill Lorenzo and he probably injured him because he did not know how to perform CPR properly. Tr. Vol. VI at 85–111.

Petitioner testified on his own behalf. Petitioner was twenty-one years old at the time of his trial. Lorenzo Merriweather died almost two years before Petitioner's trial. Petitioner was living with his grand-

mother at the time of the child's death. Petitioner was watching Lorenzo for his girlfriend, Yvette Merriweather. Lorenzo was sick and could not breathe through his nose. Petitioner loved Lorenzo and felt like he was his natural son. Petitioner and Lorenzo were sleeping in the basement, because it was cooler there. Petitioner changed Lorenzo's diaper at about midnight. Lorenzo threw up some food he had eaten earlier. Lorenzo started gasping for air. Petitioner tapped Lorenzo—not hard—in the chest to help him spit up. Petitioner then laid Lorenzo on his back and began softly pressing his chest. Petitioner denied shaking Lorenzo. Petitioner put water on Lorenzo's face to try to arouse him. Petitioner called 911, because he thought Lorenzo's heart had stopped beating. Petitioner nudged Lorenzo's chin back and forth to try to revive him, because he was not moving. Everything Petitioner did, he did because he was trying to save Lorenzo's life, not to hurt him. Petitioner hit Lorenzo with a comb trying to revive him. Later, Petitioner pressed on Lorenzo's chest, trying to perform CPR. He did not press hard. Tr. Vol. VII at 129–160. Lorenzo's eyes had rolled up in his head. Petitioner eventually bit Lorenzo several times, trying to revive him. This caused Lorenzo's eyes to "come out his head." Tr. Vol. VII at 161. Shortly thereafter, the ambulance arrived. Petitioner denied that Lorenzo had a bump on his head at this time, testifying that he only had a carpet burn. Petitioner acknowledged telling an EMS worker that Lorenzo had fallen down some steps.

Petitioner testified that he was confused when he was arrested on a charge of open murder for the death of Lorenzo Merriweather. Petitioner said he did not understand why he was being arrested. Petitioner acknowledged that he was read his rights before he was interrogated. Tr. Vol. VIII at 7. Petitioner said that he "understood the rights," except the part "about my lawyer." Tr. Vol. VIII at 29. Petitioner denied telling Ellerbrake that he hit Lorenzo in the stomach. Petitioner did demonstrate how he pressed on Lorenzo's chest. Petitioner said that Ellerbrake repeatedly told him that he had killed Lorenzo, until eventually, he (Petitioner) believed it. Petitioner was tired, upset, and had been crying before stating that he had killed Lorenzo. Petitioner denied hitting Lorenzo on the head, denied pounding him on the chest, and denied hitting him hard anywhere, including the groin area. Petitioner denied trying to hurt Lorenzo in any way, Tr. Vol. VIII at 15–49.

On cross-examination, Petitioner admitted that he had not wanted to take Lorenzo and watch him for Yvette Merriweather on Thursday, the day before he died. Petitioner testified that he first declined to watch Lorenzo, but after Yvette said that he " 'just want to 'f' some 'B,' '" he agreed to watch him. Tr. Vol. VIII at 57. Petitioner testified that Lorenzo did not simply have a cold as his sister had thought, was very sick, and was having trouble breathing due to illness. However, he did not seek medical attention for him to treat this illness, because he was not the baby's natural father and Lorenzo's mother told him if he took the baby to the hospital, "they going to try to take him from her." Tr. Vol. VIII at 65. Petitioner said that, about midnight, he first fed Lorenzo barbecue, beans, and corn and that he threw this up. Petitioner testified that he then fed Lorenzo a banana which he thought may have caused his to gasp for breath. Petitioner was initially unresponsive when asked why he would wake up a seventeen month old baby he thought was very sick to feed him at about midnight. Petitioner then testified that he did so because he did not know if the baby had eaten, Petitioner said that the EMS technicians who testified that he gave no explanation of why Lorenzo had stopped breathing were lying. *Id.* at 74.

Petitioner denied having any knowledge of how Lorenzo sustained the severe internal injuries he suffered. Petitioner acknowledged having said that he killed Lorenzo because he did not know how to take care of him. Petitioner said that he believed this because of what Ellerbrake told him. Petitioner acknowledged that biting Lorenzo, hitting him with a comb, throwing water on his face, and pressing gently on his chest would not have caused his death. Petitioner further testified that Ellerbrake had convinced him that he caused the fatal injuries by pushing too hard, despite his recollection that he did not touch him very hard.

Petitioner acknowledged that, in his statement to the police, he made no mention of not understanding his right to a lawyer and no request for a lawyer, in his comments at the end of his statement, or anywhere else. Petitioner admitted being told that, if he wanted a lawyer, he could "get one right then and there." *Id.* at 207, 211; Tr. Vol. IX at 19.

Petitioner called Dr. Hampton E. Walker, Jr., a psychologist, as an expert witness. Dr. Walker testified that Petitioner was of below average intelligence, with an IQ of about 80. Dr. Walker further testified that Petitioner had compromised judgment and was very suggestible. Dr. Walker opined that, because of Petitioner's mental characteristics, the stress of Lorenzo's death combined with the stress of the interrogation, made him highly susceptible to suggestions by the police that he had caused Lorenzo's death. Dr. Walker questioned the "reliability and accuracy" of Petitioner's statements to the police. Tr. Vol. VI at 151–52. Further, Dr. Walker opined that it was "probable" that Petitioner's confession that he killed Lorenzo was a product of police suggestion, rather than a reflection of the facts, particularly since Petitioner had been exposed to nine hours of questioning. *Id.* at 159–60. Dr. Walker testified that he thought Petitioner understood his *Miranda* rights, but was too fatigued to voluntarily waive them by the end of his interrogation. *Id.* at 165–66.

Defense counsel argued that Petitioner's statement was a product of police suggestion, intimidation, and manipulation of a person with substantially subnormal intelligence and that any injuries Petitioner inflicted upon Lorenzo Merriweather occurred accidentally when he tried to save the boy's life. The jury was instructed to consider charges of second degree murder and involuntary manslaughter. The jury convicted Petitioner of involuntary manslaughter. Petitioner pleaded guilty to being a fourth felony habitual offender and was sentenced life imprisonment as a habitual offender. M.C.L. § 750.321; M.C.L. § 769.12.[4]

### III. Procedural history

Petitioner filed a direct appeal as of right, presenting the following claims:

I. The trial court erred in finding that Petitioner voluntarily waived his *Miranda* rights, where Petitioner was incompetent to waive his rights and was subjected to lengthy interrogation which overbore his will.

II. The trial court violated Petitioner's right to confrontation by improperly restricting his cross-examination of police officers concerning aspects of Petitioner's interrogation.

III. Police officers' failure to stop questioning Petitioner after he demanded to see an attorney violated his consti-

---

**4.** Manslaughter is punishable in Michigan as a first offense for up to fifteen years imprisonment. A person convicted of a fourth felony and sentenced as an habitual offender may be sentenced to life imprisonment for felonies punishable by five years or more as a first offense.

tutional rights as established by *Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988).

IV. Petitioner's offense variables were improperly scored under Michigan state law.

The Michigan Court of Appeals affirmed petitioner's convictions in an unpublished opinion. *People v. Robinson,* Michigan Court of Appeals No. 175929 (January 17, 1997).[5] The Michigan Supreme Court denied Petitioner's delayed application for leave to appeal because it was "not persuaded that the questions presented should be reviewed by this Court." *People v. Robinson,* Michigan Supreme 456 Mich. 932, 575 N.W.2d 549 (1998).

Thereafter, on or about July 2, 1998, Petitioner filed the instant petition for a writ of habeas corpus presenting the same four claims raised in his direct appeal.

## IV. Standard of Review

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (April 24, 1996)("AEDPA" or "the Act"), govern this case because petitioner filed her habeas corpus petition after the effective date of the Act. *Lindh v. Murphy,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

The AEDPA altered the standard of review that a federal court must use when reviewing applications for writs of habeas corpus.

As amended, 28 U.S.C. § 2254(d) provides that:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

■ The United States Supreme Court has recently addressed the question of the proper interpretation of the amendments to the habeas corpus statute concerning entitlement to relief. The Supreme Court has stated that "[i]n sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000). The Supreme Court summarized the standard of review as follows:

Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state-court adjudication resulted in a decision that (1) "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of

---

**5.** Judge Myron H. Wahls issued a written dissent. In his dissent, Judge Wahls set forth his view that Petitioner's "confession was one of, if not *the* most crucial piece of evidence which the prosecution presented" and that the trial judge had invaded the province of the jury by finding that Officer Herrera was at a polygraph examination only for security pur-

poses. Judge Wahls disagreed that any error in restricting cross-examination was harmless beyond a reasonable doubt and would have reversed Petitioner's conviction and remanded the case to the trial court for a new trial. *People v. Robinson,* Michigan Court of Appeals No. 175929 (Wahls, J., dissenting) at 1–2.

the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams,* 120 S.Ct. at 1523.

"[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams,* 120 S.Ct. at 1521. The reviewing court must be aware that "an unreasonable application of federal law is different from an incorrect application of federal law." *Williams,* 120 S.Ct. at 1522.

■■■ Where constitutional trial error has been shown and the reviewing court concludes that the error had a substantial and injurious effect or influence in determining the jury's verdict, a state court ruling finding such error harmless beyond a reasonable doubt is outside the realm of plausible, credible outcomes and the petitioner is entitled to habeas relief. *Barker v. Yukins,* 199 F.3d 867 (6th Cir.1999), *cert. denied,* 530 U.S. 1229, 120 S.Ct. 2658, 147 L.Ed.2d 273 (2000). "[A] state court's application of federal law is unreasonable and a writ may issue only if reasonable jurists would find it so arbitrary, unsupported or offensive to existing precedent

as to fall outside the realm of plausible, credible outcomes." *Barker,* 199 F.3d at 871. "When a habeas court is in grave doubt as to the harmlessness of an error that affects substantial rights, it should grant relief." *O'Neal v. McAninch,* 513 U.S. 432, 445, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). "Only if a federal habeas court can say with certainty that a trial error had little or no impact on the judgment, should the judgment stand." *Barker,* 199 F.3d at 873.

■■■ The federal court reviewing a habeas petition must apply the presumption of correctness to evidence-supported factual determinations made by a state court. *West v. Seabold,* 73 F.3d 81, 83 (6th Cir. 1996); *cert den.* 518 U.S. 1027, 116 S.Ct. 2569, 135 L.Ed.2d 1086 (1996); *Lundy v. Campbell,* 888 F.2d 467, 469 (6th Cir.1989), *cert. denied,* 495 U.S. 950, 110 S.Ct. 2212, 109 L.Ed.2d 538 (1990). This presumption may only be overcome by the presentation of clear and convincing evidence by the petitioner. 28 U.S.C. § 2254(e)(1).

## V. Analysis

### A. Claim I–Waiver of *Miranda* rights

Petitioner claims that his *Miranda* rights waiver was unknowing and involuntary. Petitioner claims that his waiver was unknowing, because he was incompetent to waive his rights due to his subnormal intelligence. He claims that his waiver was involuntary and his confession unreliable, because extended interrogation while he was grief-stricken over Lorenzo's death overbore his will and rendered his confession a product of police suggestion, not a reflection of his actual deeds.[6]

---

**6.** The United States Supreme Court has recently declined to overrule the *Miranda* decision. *See Dickerson v. United States,* 530 U.S. 428, 432, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). Characterizing *Miranda* as a "consti-

tutional decision," moreover, the Court held in *Dickerson* that *Miranda* and its Supreme Court progeny "govern the admissibility of statements made during custodial interrogation in both state and federal courts." *Id.*

■ It is undisputed that Petitioner was given *Miranda* warnings before every interrogation. A statement made during custodial interrogation is admissible against the defendant only if the statement was made voluntarily after a knowing waiver of the Fifth Amendment right against self incrimination. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). To prove a valid waiver of *Miranda* rights, the government must show: (1) that the waiver was voluntary, and (2) that defendant had a "full awareness of the right being waived and of the consequences of waiving that right." *United States v. Male Juvenile,* 121 F.3d 34, 39–40 (2d Cir.1997). Thus, a finding of a valid waiver requires both a comprehension of the rights waived and an absence of coercion—a "knowing" component and a "voluntary" component. *Id.* at 40.

■ A knowing relinquishment of *Miranda* rights can be found even where a defendant has only limited intellectual capacity. Thus, even a defendant who is classified as "mildly retarded" or having learning disabilities may waive his rights if he can comprehend sufficiently the particular rights set forth in *Miranda. Male Juvenile,* 121 F.3d at 40, (quoting *Toste v. Lopes,* 701 F.Supp. 306, 313–14 (D.Conn. 1987), *aff'd,* 861 F.2d 782, 783 (2d Cir. 1988)). The issue is whether defendant is "so incompetent that he was not aware of 'both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Male Juvenile,* 121 F.3d at 40, (quoting *Colorado v. Spring,* 479 U.S. 564, 573, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987)).

■ A voluntary relinquishment of Miranda rights is the "product of a free and deliberate choice rather than intimidation, coercion, or deception." *Male Juvenile,* 121 F.3d at 41; *Smith v. Sullivan,* 1 F.Supp.2d 206, 213 (W.D.N.Y.1998). The relevant test is whether defendant's statement was obtained "by physical or psychological coercion or by improper inducement so that [defendant's] will was overborne." *Smith,* 1 F.Supp.2d at 213 (quoting *Derrick v. Peterson,* 924 F.2d 813, 817 (9th Cir.1990)), *cert. denied,* 502 U.S. 853, 112 S.Ct. 161, 116 L.Ed.2d 126 (1991). A claim that a statement was given in the absence of a valid waiver is evaluated under a "totality of the circumstances" approach. *Diaz v. Senkowski,* 76 F.3d 61, 65 (2d Cir.1996). Factors to be considered include "the type and length of questioning, the defendant's physical and mental capabilities, and the governing method of interrogation." *Id.,* quoting, *United States v. Okwumabua,* 828 F.2d 950, 953 (2d Cir. 1987). "Only if the totality of the circumstances 'reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.'" *Male Juvenile,* 121 F.3d at 40 (quoting *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)).

■ Where, as here, a state court has adjudicated the merits of Petitioner's claim, the federal habeas corpus statute, the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") states that relief may not be granted unless: (1) the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law ..." or (2) the state court decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Both AEDPA and its predecessor statute recognize the presumption of correctness to be applied to state court findings of fact. *See* 28 U.S.C. § 2254(e)(1); *Whitaker v. Meachum,* 123 F.3d 714, 715 n. 1 (2d Cir.1997). AEDPA, however, adds an additional burden to the habeas petitioner, requiring "clear and

convincing" evidence to effectively rebut the presumption of correctness. 28 U.S.C. § 2254(e)(1); *see Smith v. Sullivan*, 1 F.Supp.2d 206, 210 (W.D.N.Y.1998). "The touchstone for a reasonable determination is 'whether the determination is at least minimally consistent with the facts and circumstances of the case.'" *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir.), *cert, denied*, 522 U.S. 819, 118 S.Ct. 72, 139 L.Ed.2d 32 (1997). Habeas corpus relief may not be granted unless the state court's decision is objectively unreasonable.

■■■ Here, as noted, Petitioner takes issue with both the knowing and voluntary nature of the waiver of his *Miranda* rights. The totality of the circumstances, as revealed in the state court record, supports neither argument. Petitioner contends that his intelligence test scores indicate that he is of subnormal intelligence, and therefore, was incompetent to understand and waive his rights. This claim is belied by a number of factors evidenced in the record. First, at a trial court evidentiary hearing addressing the voluntariness of Petitioner's statements to the police, a clinical examiner for the trial court's psychiatric clinic testified that Petitioner "was functioning much higher than the score actually indicated because he chose or rather he chose not to perform as he should have performed on the test." Evidentiary Hearing Vol. II at 10. Second, Petitioner's psychological expert, Dr. Hampton Walker, testified at trial that he believed Petitioner was competent to understand and waive his *Miranda* warnings. Tr. Vol. VI at 165–66. Third, review of Petitioner's dialogue with his police interrogators indicates that he understood his *Miranda* warnings. While being given his warnings, Petitioner asked intelligent questions about whether he could obtain an attorney immediately and received answers which he said he understood. Petitioner repeatedly replied that he under-

stood his rights when so asked. Fourth, at trial Petitioner gave extensive testimony on direct and cross-examination. Nothing in the trial record indicates that Petitioner was of subnormal intelligence, or would have been incompetent to understand his *Miranda* warnings. On the contrary, Petitioner's trial testimony shows that he was quite intelligent and fully capable of understanding difficult questions and answering them in a manner calculated to try to advance his cause. Fifth, Petitioner's address to the court at his sentencing also indicates that he is of at least normal intelligence. Sentencing Tr. dated April 5, 1994 at 26–30.

Thus, upon consideration of the state court record, this Court cannot say that the state court decision that was based on an unreasonable determination of the facts, 28 U.S.C. § 2254(d), or that the presumption of the correctness of state court factual findings has been rebutted by the introduction of "clear and convincing" evidence. 28 U.S.C. § 2254(e)(1). This Court also is persuaded of the objective reasonableness of the state courts' holdings that Petitioner's voluntarily and intelligently waived his rights. With respect to the "knowing" aspect of the waiver, Petitioner relies here, as he did in state court, on his alleged subnormal intelligence. Petitioner does not deny having been read his rights, having signed a written document indicating that he understood his rights, and having verbally told the police he understood his rights. While there was some evidence that Petitioner had a subnormal IQ, the credibility of this evidence was refuted by expert testimony that Petitioner had produced this result intentionally and by his in court and out of court statements. There is no evidence that "that [Petitioner] could not comprehend the rights that were explained and read to him." *Male Juvenile*, 121 F.3d at 40. In short, this court agrees with the holding

that Petitioner knowingly waived his *Miranda* rights and finds that Petitioner has come forward with no real rebuttal of any factual findings underpinning that decision.

■ Petitioner's argument that his statements to the police were products of coercion, suggestion, and his grief over the death of Lorenzo Merriweather are unconvincing. Evidence of coercion is lacking from both the state court record and the record before this court. Indeed, the only "evidence" of coercion is Petitioner's unsupported argument that such coercion existed. As the Michigan Court of Appeals noted, while Petitioner was detained for nine hours, it was between the hours of 1:00 p.m. and 10:00 p.m. These are normal waking hours. Petitioner was not kept up and questioned through the night. Petitioner was not physically harmed. He was not deprived of food or water or access to bathroom facilities. While Petitioner may have been upset over the death of the baby, this could not preclude the police from conducting their investigation; such a policy would hamstring homicide investigations whenever a family member or close friend of the victim was a suspect, certainly not a rare or unusual situation. Further, that Petitioner may have been grieving over the baby's death does not in itself show that his confession was coerced. In sum, there is no evidence that the type and length of questioning or the method of interrogation created an environment where it can be said that Petitioner's statement was the product of coercion, rather than the product of free choice.

Petitioner was allowed to make telephone calls. Nor does Petitioner's age render his statement obtained through coercion. Like intellectual capacity, age is only one factor to consider in the "totality of the circumstances" inquiry. While Petitioner was fairly young, he was not a juvenile and had substantial prior experience with the criminal justice system. *See*

*Smith,* 1 F.Supp.2d at 215. There is no evidence that Petitioner was of such a tender age as to render his statement obtained by coercion. Indeed, confessions obtained from much younger individuals have been upheld under a totality of the circumstances review. *See Smith,* 1 F.Supp.2d at 215 (upholding confession of a thirteen year old defendant). In sum, this court finds no evidence tending to show that Petitioner's statement was the product of coercion and agrees with the state court that his statements given to the police were given voluntarily as well as knowingly.

Upon review of the warnings provided to Petitioner, the Court holds that his *Miranda* rights were adequately conveyed. The Court further holds that Petitioner knowingly and voluntarily waived his *Miranda* rights and that his statements to the police were lawfully admitted against him at trial. The Michigan state courts' decisions rejecting his claim that his *Miranda* waiver was unknowing and involuntary are reasonable applications of federal constitutional law. Accordingly, Petitioner's claim attacking his waiver of his *Miranda* rights is denied.

**B. Claim II—Claim that Petitioner's right to counsel was violated after a request for counsel**

Petitioner contends that he made a request for counsel which the police did not honor, thereby rendering his subsequent statements unconstitutional under *Miranda* and *Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). The Michigan Court of Appeals rejected this claim, finding that Petitioner did not make a unequivocal invocation of his right to counsel.

A suspect who has "expressed his desire to deal with the police only through counsel [ ] is not subject to further interrogation by the authorities until counsel has

818

been made available to him, unless the accused himself initiates further communications, exchanges or conversations with the police." *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981). In *Roberson, supra,* the Supreme Court held that this prophylactic rule applies when a police-initiated interrogation following a suspect's request for counsel occurs in the context of an unrelated criminal investigation. 108 S.Ct. at 2096.

 The determination as to whether an accused has invoked his or her Fifth Amendment right to counsel should not rest upon whether or not, or how clearly, he or she has articulated the reasons for which counsel is desired. The average person is unaware that there exists both a Fifth Amendment right to counsel at custodial interrogation, as created by *Miranda* and a Sixth Amendment guarantee of the assistance of counsel during adversary proceedings. *United States v. Gouveia,* 467 U.S. 180, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984). An accused may not know or contemplate that different rights might be invoked based on the wording of the request, or based on the fact that the request is made to a judge as opposed to the police. A request for counsel is an assertion by an accused that he or she needs help in any further dealings with the authorities, including custodial interrogation. Any such request, whether before a judge or the police, should be considered as a per se invocation of Fifth Amendment rights. To hold otherwise, based on factors which an accused cannot reasonably contemplate, would deprive the accused of the fullest extent of constitutional protection. As Justice Marshall commented regarding the applicability of *Edwards* and the Fifth Amendment implications of a request for counsel at arraignment: [A]n accused is under no obligation to state precisely why he wants a lawyer. If we were to distinguish cases based on the

wording of an accused's request, the value of the right to counsel would be substantially diminished. As we stated in *Fare v. Michael C.,* 442 U.S. 707, 719, 99 S.Ct. 2560, 2568, 61 L.Ed.2d 197 (1979), " 'an accused's request for an attorney is per se an invocation of his Fifth Amendment rights, requiring that all interrogation cease.' "

When an accused requests an attorney before a police officer, all interrogation must cease. The simple fact that defendant has requested an attorney indicates that he does not believe that he is sufficiently capable of dealing with his adversaries singlehandedly. *People v. Bladel,* 421 Mich. 39, 63–64, 365 N.W.2d 56 (1984).

 However, the suspect must make an unequivocal assertion of his right to counsel, that is, a unequivocal request for a lawyer, before interrogation must cease. In the present case, Petitioner asked, "[c]an I get a lawyer in here right now?" after being informed that he had the right to have an attorney present before and during the time he made any statement. The police responded to this question by stating "[i]f you want." Before asking Petitioner any further questions, the police informed him that he had the right to have an attorney present at the court's expense and that he had the right to not answer any questions or make any statements. Finally, before any further substantive questions were asked, Petitioner was if he wanted an attorney, or if he wanted to make a statement. Petitioner replied that he would make a statement. Tr. Vol. VI at 80–81.

Under these circumstances, this Court agrees that Petitioner did not make an unequivocal request for an attorney. Petitioner did not say, "I want a lawyer," or "I want a lawyer in here right now." He simply *asked* if he could get a lawyer "right now." When he was told that he

could, and asked if he wanted an attorney, or wanted to make a statement, he said he wanted to make a statement. Petitioner did not invoke his right to have interrogation stop upon a request for an attorney, because he did not request an attorney. The Michigan Court of Appeals decision denying this claim was an objectively reasonable application of federal constitutional law. Therefore, this claim is denied.

## C. Claim III–Right of confrontation and trial judge's refusal to allow inquiry about police officers' motivations for questioning him as they did

Petitioner contends that his right of confrontation was violated when the trial judge refused to allow defense counsel to cross-examine police officers about their motivations for interrogating him for as much as nine hours.

The jury is entitled to evaluate the weight, credibility, and reliability of a legally voluntary confession or statement. *People v. Walker*, 374 Mich. 331, 337–38, 132 N.W.2d 87 (1965). Cross-examining police interrogators about the nature of the interrogation producing the confession may be an essential part of challenging the credibility and reliability of a confession.

 The Sixth Amendment to the United States Constitution guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." U.S. Const. amend. VI. This fundamental right of confrontation is secured for those defendants tried in state as well as federal criminal proceedings. *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The United States Supreme Court has held that "a primary interest secured by (the confrontation clause) is the right of cross-examination." *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). Indeed, the right of cross-examination is part and parcel of confrontation, and the latter is meaningless without the former.

In *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the Court reiterated much of the above and stated:

> Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness.

The courts have distinguished between general and particular attacks on a witness's credibility. One way to attack a witness's credibility is to introduce evidence of prior convictions. The proponent of such evidence seeks to provide the jury a basis for inferring that the witness is less credible than the average citizen, or a witness who has no prior criminal record. "The introduction of evidence of a prior crime is thus a general attack on the credibility of the witness. A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." *Davis*, 415 U.S. at 316, 94 S.Ct. 1105.

 The Supreme Court has emphasized that " 'the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross examination.' " *Delaware v. Van Arsdall*, 475 U.S. 673, 678–79, 106 S.Ct. 1431, 89 L.Ed.2d 674 (quoting *Davis*, 415 U.S. at 316–17, 94 S.Ct. 1105). It then elaborated that "a criminal defendant states a violation of the Confrontation Clause by showing that he

was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." *Delaware v. Van Arsdall*, 475 U.S. at 680, 106 S.Ct. 1431.

Following *Davis*, the Sixth Circuit has held that "a limitation on cross-examination which prevents a person charged with a crime from placing before the jury facts from which bias, prejudice or lack of credibility of a prosecution witness might be inferred constitutes denial of the right of confrontation guaranteed by the Sixth Amendment." *United States v. Garrett*, 542 F.2d 23, 25 (6th Cir.1976). As the Sixth Circuit has recently stated, the Sixth Amendment "compels cross-examination if that examination aims to reveal the motive, bias, or prejudice of a witness/accuser." *Boggs v. Collins*, 226 F.3d 728, 740 (6th Cir.2000). *See also, Isaac v. Grider*, 211 F.3d 1269, 2000 WL 571959 at *8 (6th Cir.2000)(unpublished order) (holding that trial judge's refusal to allowing questioning about fact that witness was incarcerated at the time he testified constituted an unreasonable application of federal law as enunciated in *Davis v. Alaska* ).

In the instant case, the defense inquired on cross-examination whether the police had tried to manipulate Petitioner's grief over Lorenzo's death to suggest to him that he had killed the boy. The defense questioned the police about the nature and length of Petitioner's interrogation. The Michigan Court of Appeals summarized Petitioner's cross-examination of the police interrogators and its view of that cross as follows:

The jury was presented with evidence concerning the times, lengths, and locations of defendant's interviews, as well as evidence that Herrera was present at the location of Ellerbrake's interview with defendant, that Herrera spoke with Ellerbrake following the interview, that Ellerbrake gave Herrera a synopsis of the interview (including the fact that defendant told Ellerbrake that he [defendant] was responsible for the death), and that the taped statement came after the interview and after Herrera spoke with Ellerbrake. Herrera was asked on both direct and cross-examination whether he coerced, threatened, or tricked the taped statement out of defendant, and was even asked on cross-examination if he used what Ellerbrake told him to "make [defendant] feel responsible" for the death. With this evidence, it was possible for defense counsel to make the argument to the jury and create the inference he offered to the trial court, i.e., that Herrera used the statement made to Ellerbrake to coerce the taped statement from defendant. We do not consider this to be a case where the limitation placed on the scope of cross-examination effectively deprived the defendant of his defense.

*People v. Robinson*, Michigan Court of Appeals No. 175929 at 3–4.

 Therefore, the Michigan Court of Appeals found that any error the trial court made in restricting the scope of cross-examination was harmless.[7]

It is exclusively the jury's province to make credibility determinations. *United States v. Schultz*, 855 F.2d 1217, 1221 (6th

---

**7.** As noted, the late Judge Myron Wahls dissented on this issue and would have reversed Petitioner's conviction upon a finding that "there is a reasonable possibility that the trial court's erroneous ruling [restricting cross-examination] might have contributed to defendant's conviction." *People v. Robinson*, Mich-

igan Court of Appeals Docket No. 175929 (Wahls, J., dissenting) at 2. Consequently, a reasonable jurist has found that Petitioner Confrontation Clause issue should have been decided differently. Therefore, Petitioner is entitled to a certificate of appealability on this issue.

Cir.1988); *Barker v. Yukins,* 199 F.3d at 874. However, Petitioner was allowed to effectively explore the nature of his interrogation by the police, including the length of the questioning, the role that different officers played, and the fact that the officers may have used information gained in one interview while conducting a later interview. Petitioner was not prevented from cross-examining any witness concerning facts from which bias, prejudice or lack of credibility of a prosecution witness might be inferred. *United States v. Garrett,* 542 F.2d at 25.

Petitioner's confession was certainly substantial evidence of his guilt. Petitioner stated that "I killed Lorenzo because I didn't know how to care for a kid. Lorenzo would be alive if someone else had been watching him." Tr. Vol. IV at 130. This statement was powerful evidence that Petitioner had committed acts which caused Lorenzo's death. However, admission of this evidence did not prevent Petitioner from arguing that he had been factually mistaken about the cause of Lorenzo's death and his role in it. Further the defense was able to argue that Petitioner's admission was not an admission of any criminal wrongdoing, but rather of mere ignorance and negligence at worst.

■ This Court concludes that the Michigan Court of Appeals finding that any improper restriction of Petitioner's cross-examination was harmless error was a reasonable application of federal law for two closely related reasons. First, Petitioner was allowed to effectively attack the reliability, credibility, and weight to be given his statements to the police. The Confrontation Clause does not require that the defense be completely unrestricted in its cross-examination of prosecution witnesses. The restrictions in the present case did not prevent Petitioner from presenting a defense, or placing before the jury its theory that Petitioner's confession was an unreliable product of police manipulation and suggestion of a mentally weak, overwrought, and grief-stricken defendant. The jury simply did not believe it.

The second reason this Court concurs that any error was harmless is that Petitioner's conviction was supported by other extremely strong evidence, in addition to Petitioner's statements. Physical evidence and expert opinion was presented in great detail which established that Lorenzo Merriweather died from multiple heavy traumatic blows to the head, chest, and midsection which caused skull fractures, tore his lungs from his body at their roots, and tore his liver and kidneys. Medical evidence showed that these injuries would not have resulted from falling down stairs or from honest but improper attempts to perform CPR. Medical evidence also showed that Lorenzo did not fall down any stairs when Petitioner claimed he did. Furthermore, Petitioner's trial testimony as a whole was completely inconsistent with the injuries suffered by the dead child. Petitioner denied hitting the child hard on the chest or stomach, denied hitting the child on the head, and said that the child fell down stairs days before it was established that his head injuries had occurred. It was undisputed that Petitioner was the last person with Lorenzo before his injuries occurred and the last person other than medical personnel who was with Lorenzo while he was still alive. Additionally, Petitioner changed his story multiple times during the police investigation. Thus, Petitioner's denial of guilt were not credible and the evidence of his guilt apart from his confession was extremely strong, if not overwhelming.

■ Even were this Court to assume arguendo that the state trial court had erred by limiting Petitioner's cross-examination of his police interrogators regarding their interrogation methods, this Court would nevertheless conclude that

such error was harmless. The violation of a defendant's right of confrontation is subject to harmless error analysis. *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). In a habeas corpus case, where a petitioner challenges his conviction collaterally, an error is harmless unless it "had a substantial and injurious effect on the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Thus, when a court considers a Confrontation Clause violation in a habeas corpus proceeding, the relevant harmless-error inquiry is "whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error," *Van Arsdall,* 475 U.S. at 684, 106 S.Ct. 1431, "had a substantial and injurious effect on the jury's verdict," *Brecht,* 507 U.S. at 638, 113 S.Ct. 1710.[8]

Under the *Brecht* standard, even if this Court assumes for the sake of argument that Confrontation Clause error occurred, this Court holds that any error did not have a "harmful or injurious effect" on the fundamental fairness of the trial. As the government points out, the other evidence (besides Petitioner's statements to the police) was extremely strong. Further, the restriction on his ability to cross-examine his police interrogators was at most minimal. Given these facts, any error was harmless. Petitioner's Confrontation Clause claim is therefore denied.

## D. Claim IV—Challenge to state law errors concerning Petitioner's offense variables

█ Petitioner contends that the trial court incorrectly scored his offense variables. This claim does not entitle Petitioner to relief for several reasons. First, it is a matter of state law, and claims of errors of state law alone are not cognizable in habeas corpus. A federal writ of habeas corpus reaches only convictions and sentences obtained in violation of some provision of the United States Constitution. *Smith v. Phillips,* 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). " '[F]ederal habeas corpus relief does not lie for errors of state law.' " *Estelle v. McGuire,* 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)(quoting *Lewis v. Jeffers,* 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990)). *See also, Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984) and *Floyd v. Alexander,* 148 F.3d 615, 619 (6th Cir.)(concluding that violation of state law is not cognizable in federal habeas corpus proceedings), *cert. denied,* 525 U.S. 1025, 119 S.Ct. 557, 142 L.Ed.2d 464 (1998).

█ Second, in order to prevail on a claim that a trial court relied on inaccurate information at sentencing, a habeas petitioner must demonstrate that the sentencing court relied upon this information and that it was materially false. *Collins v. Buchkoe,* 493 F.2d 343, 345–346 (6th Cir. 1974); *Welch v. Burke,* 49 F.Supp.2d 992, 1007 (E.D.Mich.1999)(Cleland, J.). Petitioner's claim regarding his offense variables may be liberally construed as a claim that he was sentenced on mistaken information. However, the evidence in this case showed that Petitioner caused the death of a seventeenth month old child in his exclusive care by striking him repeated traumatic blows to the head, chest, and mid-section. Petitioner had four prior fel-

---

**8.** The Sixth Circuit has recently applied Brecht harmless error analysis to a Confrontation Clause challenge despite the fact that it does not appear that the state court engaged in harmless error analysis. *See Norris v. Schotten,* 146 F.3d 314, 330 (6th Cir.1998).

The Sixth Circuit has more recently held that the harmless error standard announced in *Brecht* applies even if a federal habeas court is the first to review for harmless error. *Gilliam v. Mitchell,* 179 F.3d 990, 995 (6th Cir. 1999).

onies. His sentence was not based on mistaken information. Because Petitioner has failed to demonstrate in his petition that the sentencing court relied upon materially false information in imposing sentence, this claim is without merit. *Thomas v. Foltz*, 654 F.Supp. 105, 108 (E.D.Mich. 1987)(Cohn, J.).

 Moreover, to the extent that petitioner is claiming that his sentence violates the Michigan state sentencing guidelines, his claim is not cognizable in a habeas proceeding because it is a state law claim. *Id.; See also Johnson v. Abramajtys*, 951 F.2d 349, 1991 WL 270829, *9 (6 th Cir. Dec. 17, 1991)(Michigan Sentencing Guidelines are not mandatory, do not create substantive rights, and are merely a tool used to assist the sentencing judge in the exercise of discretion). A claim that a sentence is imposed in violation of Michigan's sentencing laws does not state a claim for relief in a habeas proceeding where there is no allegation that the sentence violates the cruel and unusual punishment clause of the Eighth Amendment to the U.S. Constitution. *See Atkins v. Overton*, 843 F.Supp. 258, 260 (E.D.Mich.1994)(Gadola, J.). Further, even under Michigan law, the sentencing guidelines did not apply, because Petitioner was sentenced as a habitual offender. *People v. Dixon*, 217 Mich.App. 400, 411, 552 N.W.2d 663 (1996).

 In the present case, Petitioner's sentence of life imprisonment for involuntary manslaughter as a fourth felony habitual offender within the statutory limits. A sentence imposed within the statutory limits is not generally subject to habeas review. *Townsend v. Burke*, 334 U.S. 736, 741, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948); *Cook v. Stegall*, 56 F.Supp.2d 788, 797 (E.D.Mich.1999)(Gadola, J.). Because petitioner's sentence falls within the statutory limits, petitioner is not entitled to habeas relief. Because petitioner does not

claim that the sentence imposed violates the cruel and unusual punishment clause of the Eighth Amendment, he has failed to state a claim upon which habeas relief can be granted. Further, even if Petitioner claimed his sentence was cruel and unusual punishment, this claim would fail, because a life sentence for manslaughter as a fourth felony habitual offender is not grossly disproportionate to the crime and the offender. The United States Supreme Court has observed, successful challenges to the proportionality of particular sentences in non-capital cases are "exceedingly rare." *Rummel v. Estelle*, 445 U.S. 263, 272, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980); *see also Harmelin v. Michigan*, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (mandatory term of life imprisonment without possibility of parole for possession of more than 650 grams of cocaine does not constitute cruel and unusual punishment). The Sixth Circuit Court of Appeals has stated that "[f]ederal courts will not engage in a proportionality analysis except in cases where the penalty imposed is death or *life in prison without the possibility of parole.*" *United States v. Thomas*, 49 F.3d 253, 260–61 (6th Cir.1995)(emphasis added).

Under Michigan law, a prisoner "convicted as an habitual offender and sentenced to life imprisonment" is "eligible for parole after the expiration of ten calendar year," unless the minimum term for the underlying felony fixed by the sentencing judge at the time of sentence was longer than ten years. *Manuel v. Department of Corrections*, 140 Mich.App. 356, 358, 364 N.W.2d 334 (1985). Offenses that require a nonprofitable life sentence in Michigan include first-degree premeditated murder and first-degree felony murder, M.C.L. § 750.316, certain drug offenses over 650 grams, treason, M.C.L. § 750.544, placing explosives with intent to destroy which causes injury to a person, M.C.L. 750.207,

and certain repeat drug offenses. *People v. Edgett,* 220 Mich.App. 686, 689 n. 3, 560 N.W.2d 360 (1996); *People v. Poole,* 218 Mich.App. 702, 705, n. 7, 555 N.W.2d 485 (1996). A sentence of life imprisonment is mandatory for conspiracy to commit first-degree murder. *People v. Fernandez,* 427 Mich. 321, 398 N.W.2d 311 (1986). However, the life term for conspiracy to commit first-degree murder is parolable. *People v. Jahner,* 433 Mich. 490, 446 N.W.2d 151 (1989). Petitioner's underlying felony in this case was involuntary manslaughter, not murder or conspiracy to murder. The trial judge sentenced Petitioner to "life," not life without the possibility of parole. Sentencing Tr. at 40. Given this authority and the facts of Petitioner's case, it is clear that Petitioner cannot show that his sentence violates the Eighth Amendment.

## VI. Conclusion

The court concludes that Petitioner's claims lack merit and do not entitle him to federal habeas relief. His conviction and sentence do not involve a judgment which is an unreasonable application of clearly established federal constitutional law. Therefore, Petitioner is not entitled to habeas corpus relief. A reasonable Michigan Court of Appeals jurist wrote in dissent that he would have reversed Petitioner's conviction and granted him a new trial on the basis of the trial court's restriction of the defense's cross-examination of certain police witnesses. Therefore, this Court concludes that it would be disposed to grant Petitioner to a certificate of appealability on his cross-examination issue. 28 U.S.C. § 2253; *Slack v. McDaniel,* 529 U.S. 473, 120 S.Ct. 1595, 1603–04, 146 L.Ed.2d 542 (2000). This Court would decline to issue a certificate of appealability concerning Petitioner's other issues, because the Court is not persuaded that reasonable jurists would find the Court's denial of these claims debatable.

Accordingly,

**IT IS HEREBY ORDERED** that the petition for a writ of habeas corpus is **DENIED WITH PREJUDICE.**

Additionally, the Court notes that it would be disposed to granting a certificate of appealability with regard to Petitioner's claim challenging the trial court's restriction of defense cross-examination.